STATE OF CONNECTICUT *v.* ISRAEL MADERA
(13198)

HEALEY, SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued November 3, 1988—decision released February 14, 1989

*John F. Murphy, Jr.,* with whom was *Raymond T. DeMeo,* for the appellant (defendant).

*Carolyn K. Longstreth,* deputy assistant state's attorney, with whom, on the brief, was *Julia DiCocco Dewey,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Israel Madera, also known as Israel Flores, was found guilty by a jury of fourteen counts of the crime of arson murder in violation of General Statutes § 53a-54d.[1] Those

---

[1] General Statutes § 53a-54d, entitled "Arson murder," provides: "A person is guilty of murder when, acting either alone or with one or more per-

crimes arose out of the deaths of fourteen persons in a fire in an apartment building in Waterbury on July 5, 1982. The defendant has appealed from these convictions.

On appeal, the sole issue raised by the defendant is whether his confession of July 5, 1982, was obtained involuntarily and without a valid waiver of his *Miranda*[2] rights in violation of the fourteenth amendment[3] to the United States constitution and article first, § 8, of the constitution of Connecticut.[4] The defendant's confession was a typewritten statement signed by him that the trial court, *Glass, J.,* refused to suppress after a hearing that extended over six days and at which six-

---

sons, he commits arson and, in the course of such arson, causes the death of a person. Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

[2] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The fourteenth amendment to the United States constitution provides: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[4] The constitution of Connecticut, article first, § 8, provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

teen witnesses testified.[5] This confession was later introduced at the defendant's trial, at which he did not testify.

Prior to our discussion of any of the evidence developed at the suppression hearing, we point out that the trial court, *Glass, J.,* at the outset, indicated that a Spanish-speaking official court interpreter was present

---

[5] The motion to suppress was as follows: "The defendant, Israel Madera-Flores, pursuant to Section 820 et seq. of the Connecticut Practice Book, hereby moves to suppress from admission into evidence a statement signed by the defendant on July 5, 1982, while in the custody of the Waterbury Police Department. Such statement should be suppressed for any or all of the following reasons:

"1. Suppression is required under the Constitution or laws of the United States or the State of Connecticut.

"2. The statement, which was the product of police-initiated interrogation, was not given by the defendant with a clear understanding of his rights, including the right to counsel and the right to remain silent.

"3. The statement was taken from the defendant by the Waterbury Police Department in such a way that the defendant was unable to comprehend the significance of his constitutional rights thus precluding the defendant's voluntary, knowing and intelligent waiver if his rights.

"4. The defendant's difficulty with the complexities of the English language precluded his ability to meaningfully grasp his constitutional rights.

"5. The defendant's physical, emotional and psychological condition precluded his ability to meaningfully grasp his constitutional rights.

"6. The defendant's physical, mental and emotional history was such that his susceptibility to surrounding pressures, express or implied, made the statement taken from the defendant while in custody involuntary.

"7. The defendant's will to resist was overborne by police conduct and his capacity for self-determination was so impaired that the statement which was the product of custodial interrogation was not voluntarily given.

"8. The interrogation practices of the Waterbury Police Department, including psychological coercion, ploys, inducements and promises, demonstrate that the defendant's statement was not the product of free and unconstrained choice.

"9. For all of the above reasons, the State of Connecticut cannot meet its burden to show by a fair preponderance of the evidence that the defendant fully understood his constitutional rights and intentionally relinquished or abandoned those rights in signing the statement prepared by the Waterbury Police Department on July 5, 1982."

The trial court's comprehensive memorandum of decision denying suppression comprises twenty-seven pages in the printed record.

and available to assist the defendant by translating English to Spanish and Spanish to English. The defendant's counsel, however, specifically informed the court that he wished to question Madera without the use of the interpreter. In making this request, he said that he did so because it was "essential to the issue here that the court get an idea of [the defendant's] ability to understand English."[6] Our examination of the record discloses, as the trial court found, that this defendant understood his attorney's request. The court at that time also cautioned the defendant that if any statements were made that he did not understand, he was to inform the court so that the interpreter could be used.[7] Moreover, a number of times during the suppression hearing the court noted that the interpreter was present and available.

---

[6] At that time, the defendant's counsel stated: "Now, if your Honor please, what I want to do in this proceeding is question Israel Madera without the use of the interpreter. I'm going to specifically request—I know the state and the court has been very cooperative in terms of seeking an interpreter. For the sake of this proceeding, I would ask that he not have translated into Spanish for his understanding of English. He does understand English words. I think it's essential to the issue here that the court get an idea of his ability to understand English."

[7] After the defendant had answered one question on direct examination by his attorney as to the date of his arrest for the crimes involved, the following occurred:

"Mr. Murphy: Now, if your Honor please—

"Mr. McDonald: It would be helpful if he can keep his voice up, too, your Honor.

"The Court: Mr. Madera, the acoustics here in the courtroom are pretty bad. In order for you to be heard by your lawyer and by the state's attorney and everybody else in this courtroom, you have to speak into the microphone there. Come up close enough so you can speak into that contraption there. You have got to speak into it and loudly. Do you understand me?

"The Witness: Yeah.

"The Court: Do you understand what I'm saying?

"The Witness: Yeah. . . .

"Mr. Murphy: Now, if your Honor please, the interpreter has been translating simultaneously everything that you have said. I would like to specifically request at this point that the interpreter come to the desk here.

Certain general background circumstances from the record concerning Madera's written statement are appropriately set out at this juncture and will be expanded upon later as necessary. At about 2:10 a.m., on July, 1982, James Deeley, a detective of the Waterbury police department, arrived at the scene of the fatal fire at 45-47 Prospect Street. After his arrival, he learned from Officer Michael DiMaria, who was already there, that DiMaria had a suspect in his patrol car. Deeley also spoke to Lydia Madera, the defendant's niece, Roberto Ramos and John Wrogg at the fire scene. He then entered the patrol car where the defendant was sitting and advised him of his *Miranda* rights in English, which the defendant stated in English that he understood. On the basis of what he had already ascertained, Deeley then told the defendant that he was accused of setting fire to a couch in Lydia Madera's

"The Court: All right.

"Mr. Murphy: Without the benefit of the interpreter, until such time as the state puts witnesses on, and she can advise him.

"The Court: Let me say this, Mr. Madera: If there is anything that is asked you, anything that is said that you do not understand, you will let me know.

"The Witness: Yeah.

"The Court: Speak into that.

"The Witness: Yeah.

"The Court: Do you understand that?

"The Witness: Yeah.

"The Court: The interpreter is here. We will have her translate for you, if there is anything you don't understand.

"The Witness: Yeah.

"The Court: Do you understand me now?

"The Witness: Yeah.

"The Court: All right, then, you may come down.

"(Interpreter steps back from witness stand.)

"Mr. McDonald: I think the record should reflect, your Honor, all of Mr. Madera's answers up to now were given in English and not translated by the interpreter.

"The Court: Record may reflect that the accused has been conversing with his counsel as well as the court in English; there has been no translation. All right. Proceed, sir."

apartment that was in the building on fire.[8] The defendant denied this accusation and said that someone named Jose had set fire to the couch. Deeley questioned the defendant no further at that time. Deeley said that although he detected the odor of alcohol on the defendant's breath, he did not appear to be drunk, his speech was not slurred and he walked without difficulty. He arrested the defendant and went with him to the police station where he turned him over to Officer Joseph Flaherty for booking. This transfer took place about 3 a.m.

Deeley, in the presence of Sergeant Cass, then spoke to the defendant again about 6:15 a.m. on the same morning, first advising him again of his *Miranda* rights in English. The defendant said that he understood these rights. Deeley again inquired concerning his setting fire to the couch. Madera emphatically denied that he had

---

[8] The defendant testified at the suppression hearing that, prior to the couch fire in Lydia Madera's apartment at 45-47 Prospect Street, he had been drinking heavily and that he had fallen asleep on a couch in that apartment while smoking a cigarette. The cigarette fell on the couch and set it afire; he awakened, and with one of Lydia's friends, he got some water and put out the couch fire. The defendant testified that, upon learning of this fire to her couch, Lydia began arguing with him about that fire and his drinking. He said that he left the apartment, but a short time later he returned, knocked on the door and asked Lydia to give him some matches to light a cigarette. He also testified that he received some matches from her, lit his cigarette and left the building and that, thereafter, while the building was on fire, Lydia came out of the building, started beating him and accusing him of starting the fire in the building. He denied to Lydia that he set the fire. Madera also testified at the suppression hearing that he did not agree with his typewritten statement given to the police on the evening of July 5, 1982, about "ripping up the book and starting the fire."

In his typewritten statement of July 5, 1982, which the defendant sought to suppress, after stating that Lydia gave him the matches he requested and then she closed the door, the defendant said: "I got mad, the other guy came up the back stairs and he told me that this was no place for my niece [Lydia Madera] to live, it stunk and he left, I don't know where he went. I was still outside in the hall and I found a book, I ripped up the book, I put the paper on the stairs leading downstairs to the first floor, and I lite the paper with the matches Lydia gave me. I lite the fire because this other guy told me that this was no place for Lydia to live. . . . "

set any fire. This conversation between Deeley and Madera was in English and lasted, said Deeley, "just a few minutes."

Shortly thereafter, at about 6:30 a.m., while Flaherty was in the cell block, Madera told Flaherty that he was going to be sick. As Flaherty came to aid him, the defendant, according to Flaherty, fell to the floor of his cell, became rigid, his eyes began to roll around and he began to shake. An ambulance was called. The defendant, in handcuffs, walked to the ambulance and was admitted to the emergency room of St. Mary's Hospital in Waterbury at 6:50 a.m. The examining physician, Dr. Gerardo Querijero, found his vital signs and reflexes normal. Although the doctor did detect the odor of alcohol on his breath, Madera was not drunk or intoxicated. Finding him in good physical condition and devoid of any grand mal seizure symptoms, the examining doctor's diagnosis was "anxiety reaction." Madera was discharged at 7:51 a.m. and was returned to his police cell.

Subsequently, the defendant was further questioned by Lieutenant Anthony Solomita of the Waterbury police department on three occasions on July 5, 1982. The first such occasion was about 9 a.m. when Solomita, with Sergeant Charles Messina present, questioned Madera. Before doing so, Solomita advised him in English of his *Miranda* rights from a blue rights card used by the Waterbury police. He explained each right in English and the defendant answered "yes" when asked each time if he understood that particular right. The defendant, however, testified at the suppression hearing that he was not advised of his rights by Solomita. This conversation at approximately 9 a.m. was entirely in English. Solomita said that he talked to Madera for "about five minutes," and upon inquiry as to whether he started the fire, the defendant repeat-

edly responded by saying "the other guy did it." Madera was then returned to his cell.

About 10:15 a.m., Madera was brought to the interrogation room by Solomita, who, prior to any questioning, again advised him of his *Miranda* rights from the blue rights card. Again, during his testimony at the suppression hearing, the defendant emphatically denied that he had been advised of his rights at this time. The defendant testified that he was asked by Solomita if he "make" the fire and whether he had used gas in doing so. He denied making any fire. At this interview, all of the defendant's clothes were taken from him to be examined for evidence of any combustible material. His clothing was replaced by clothing and sandals obtained from St. Mary's Hospital. Thereafter, he was returned to his cell where he remained until about 8:05 p.m. that night. During the day, Madera was monitored by a television camera focused exclusively on his cell. During that time, the defendant sat on his bed or slept most of the day. He was provided with food at noon and also between 5 and 7 p.m.

About 8:05 p.m., on July 5, 1982, Solomita again had the defendant brought to the interrogation room. Assistant State's Attorney John Connelly was there. Lieutenant Valentine Bochicchio was in and out of the room while the defendant was there. Solomita again read the defendant his rights from the blue card in English and the defendant told him that he understood them. He also told Solomita that he did not read or write. Madera then waived those rights and gave an oral statement in English. During the narration of that statement, while being asked what he had used to start the fire, Madera had trouble, in designating the material he lit to start the fire outside Lydia's apartment, with the appropriate word for that as to whether he was describing a book, magazine, newspaper or periodical. After the defendant gave an oral statement,

Solomita asked him if he would give it in writing. The defendant nodded his head affirmatively and said, "yes."

After the defendant's narration in English about his actions with reference to the fire and his difficulty in describing precisely in English what was used to start the fire, Solomita and Connelly decided to get a Spanish interpreter before proceeding to take a written statement from him. Being unsuccessful in locating an official court interpreter, Bochicchio sent for Officer Hiram Diaz, a Waterbury policeman who spoke Spanish, to come and assist in this matter. Diaz, as well as other Spanish-speaking Waterbury policemen, were often used when there were communication problems with Spanish-speaking persons at the Waterbury police department.

After Diaz arrived, Solomita said Madera wanted to talk and Diaz asked him if this were so. Madera told Diaz, "yes, he wanted to get it off his chest." Solomita read to Madera in English his *Miranda* rights that are printed at the top of the "Voluntary Statement" form[9] that was used by the Waterbury police department and on which Madera's confession was thereafter typewritten and signed by him. As Solomita read each right, he explained each one and, upon inquiring of the defendant concerning each right, received an affirmative response that he understood each of these rights. Diaz then repeated in Spanish what Solomita had read and explained in English to Madera. Diaz then read and explained again to Madera his rights using a copy of a card used by the Waterbury police department that is in Spanish and contains the *Miranda* warnings. As requested by Solomita, Madera placed his initials in the

---

[9] After each of the *Miranda* rights printed on the "Voluntary Statement" form there is a box space. These printed *Miranda* rights were at the top of the first page of Madera's statement that covered two typewritten pages.

box space after each printed enumerated *Miranda* right on the "Voluntary Statement" form. In addition, Madera signed his name on the back of the blue rights card as well, putting the date "7-5-82" and the time "8:27 p.m." on the back of that card. The defendant, at the suppression hearing, said that he signed the blue card because the Spanish police officer "told me to sign, so I sign." During his testimony at that hearing, the defendant testified that at no time during this third meeting with Solomita did Connelly, Bochicchio, Diaz or Solomita or anyone else ever advise him of his rights.

The trial court's memorandum indicates that, according to the testimony of Solomita, Connelly, Bochicchio and Diaz, after the defendant was advised of his rights in English and in Spanish, and upon inquiry responding that he understood those rights and that he wanted "to get it off his chest" and after initialing each enumerated printed right at the top of the printed "Voluntary Statement" form, Madera gave a verbal statement in English that he was told would be reduced to writing, in which he told how he started a fire in the building at 45-47 Prospect Street. Solomita testified that Madera said that he wanted to give the written statement. This statement was two pages long; it began right under the printed *Miranda* rights he had initialed earlier on the "Voluntary Statement" form. The statement[10] was typed by Solomita on a typewriter in the interrogation room and it took about forty-five minutes to take it.[11]

---

[10] According to Diaz, the only problem that Madera had with English concerning his statement as it was being typed was the word "periodico" which Diaz said meant "book or magazine." It appears that that became "book" in the typewritten statement. It was the word "periodico" which had earlier caused some difficulty and was a reason for endeavoring to obtain the presence of a Spanish-speaking person that ultimately resulted in the appearance of Diaz.

[11] On its face, the statement indicates that it was started on July 5, 1982, at 8:28 p.m. and finished at 9:15 p.m. on that date.

After Solomita had finished typing the statement, he sent for Lieutenant Humphrey Bridges, who was the desk officer at that time and who was also a notary public for police matters. After Bridges got to the interrogation room, the statement was read to Madera in English by Solomita, then read again to Madera in English by Bridges, and finally it was read to Madera in Spanish by Diaz. After these three readings, Solomita then added the last paragraph on the second page: "This statement was read back to me in English by both Lt. Anthony Solomita [and] Lt. Humphrey Bridges [and] it was read back to me in Spanish by Officer Hiram Diaz. It is the truth. Officer Diaz also notified me of my rights in Spanish [and] I understand them. I gave this statement voluntar[ily]."[12] The defendant then placed his initials after the word "voluntar[ily]" in this added paragraph and signed his signature at the bottom of the second page. Diaz signed as a witness, and Bridges notarized the statement. Shortly thereafter, Madera was returned to his cell.

Against this background, the trial court, at the suppression hearing,[13] was presented with evidence of the

---

[12] Solomita testified that as soon as the statement was typewritten and before Bridges arrived in the interrogation room, the defendant placed his initials right after the very last word on page two of the typewritten statement. He said that this was done because Solomita knew that this matter would probably go to court and that Madera would have an attorney and that doing this "would show that we didn't add anything after his initials."

[13] At the supression hearing, certain records concerning Madera's mental and physical history were introduced as defendant's exhibits. These included: records of the W. W. Johnson Life Center, Inc., of Springfield, Massachusetts, the Northampton State Hospital in Northampton, Massachusetts, the hospital record of St. Mary's Hospital in Waterbury, Connecticut, for the emergency room visit of July 5, 1982, and the Whiting Forensic Institute record covering the period from July 9, 1982, to March 7, 1983. Certain of these reports make reference to other mental institutions with which Madera had contact in the past.

Two physicians testified at the suppression hearing. The first was Fred R. Volkmar, a psychiatrist, who had seen Madera on the occasion of his admission to Whiting Forensic Institute on July 9, 1982. He conducted the

mental, physical and social history of Madera. This included evidence that "tended to show," according to the court, that he was an epileptic and that he had experienced seizures since he was about fifteen years old.[14] The "Summary of Service" report[15] of W. W. Johnson Life Center, Inc., dated January 13, 1982, which was signed by James A. Smith, a psychiatrist, and Jaime Maldonado, a therapist, who saw Madera on thirty-eight occasions between December 14, 1981, and March, 1982, stated that "[t]he prognosis at this time is one of a manic-depressive of a mixed type." There was also evidence presented by Madera that he had entered the Whiting Forensic Institute in Middletown from confinement at the New Haven community correctional center on July 9, 1982, and that he remained there until March 7, 1983, when he was returned to the

intake interview and examination. The second was Gerardo Querijero, a surgeon at St. Mary's Hospital, who examined Madera in the emergency room on July 5, 1982. Jaime Maldonado, a therapist at the W. W. Johnson Life Center, Inc., also testified. Maldonado had seen Madera on approximately thirty-eight occasions between December 14, 1981, and March, 1982. Madera had been a client of this center on several occasions during the late 1970's and early 1980's prior to this.

[14] The defendant was twenty-nine years old at the time of the suppression hearing.

[15] This report also included the following statements: "Emotional: Israel frequently experience[s] depression, nervousness, and complains of auditory and visual hallucinations, which lead him to become fearful. He becomes nervous and depressed when unable to find solutions to present situations. This factor contributes to his having audio visual hallucinations. Israel will tend to take an excessive amount of his current medication to help self relax when experiencing these symptoms. Israel has attempted suicides on various occasions, unsuccessfully, due to his audio hallucinations. Israel's problem[s] are further complicated by epileptic seizures.

"Intellectual: Israel experiences laps[es] of memory during times of stress. He has an eighth grade level of education, yet does not know how to read or write. He communicates well in the spoken language. He has little problem in Spanish and knows survival English. At the present time Israel is confused in what to do with his life, and seeks help in order to prevent further deterioration."

correctional center. On his admission to Whiting, Fred R. Volkmar, the psychiatrist who conducted a mental status examination[16] of the defendant, made a diagnosis of schizophrenia, chronic undifferentiated type. Volkmar testified at length during the suppression hearing not only about his examination and impression of Madera, but also concerning Madera's subsequent treatment at Whiting Forensic Institute. The discharge summary from Whiting Forensic Institute, which is dated

[16] Volkmar's statements on Madera's admission in the Whiting Forensic Institute record include the following: "This is the first Whiting Forensic Institute admission for this 29-year-old, Puerto Rican male who was transferred here from New Haven Jail. The history is obtained from the patient. The following barriers to communication should be mentioned. The patient is primarily Spanish speaking although he does both understand and speak some English. The patient denied memory of or recall for many specific events. Patient also appeared to be somewhat suspicious about providing details of his past history. It was unclear how much his difficulties related to his intellectual level and how much they related to his suspiciousness. Basically, the patient reports that he was falsely arrested and accused of setting a fire in Waterbury in which multiple persons were killed. The patient states that he was transferred from New Haven Jail to this facility but is not sure of the reasons for the transfer. The patient states that at the time the fire was set, he was 'high,' 'sick,' and drinking. The patient was unable/unwilling to provide other details of the events that led to his admission here. . . .

"On mental status examination, the patient was a Puerto Rican male who looks slightly older than his stated age. Barriers to communication were mentioned above. The patient was somewhat agitated in appearance. Speech was generally of normal rate and intensity. Kinetics were remarkable for the patient's agitation. The patient was alert and oriented. The patient knew the date approximately.

"He was oriented to place and person exactly. It was difficult to assess memory precisely. Patient's speech was generally responsive to the questions asked although often quite sparse. Thought content was remarkable for the following: audible thoughts, multiple auditory hallucinations, ideas of reference and control, ideas of influence. Affect was somewhat anxious as well as depressed. Patient denied current suicidal ideation. It was difficult to accurately evaluate the patient's level of insight and judgment. The patient did appear to be somewhat suspicious but again it was difficult to evaluate to what extent this related to mental illness and to what extent it related to his current legal situation. Intellectual functioning appeared to be consistent with patient's stated level of education. . . ."

March 7, 1983, notes that "[o]n discharge [the defend-ant's] mental status and condition were both improved." The "Final Diagnosis"[17] made was:

"Axis I: 292.90 Mixed Organic Mental Disorder, in remission.

"305.90 Unspecified Substance Abuse.

"305.00 Alcohol Abuse, unspecified.

"Axis II: 301.84 Passive-Aggressive Personality Disorder.

"Axis III: Seizure disorder, related to excessive alcohol abuse and subsequent organicity.

"Axis IV: 6—extreme.

"Axis V: 5—poor."

This discharge summary of the defendant was signed by his treating psychiatrist, Michael Sheard, a consulting psychiatrist, and Nellie Cartegena, a psychiatric social work associate.

A number of police officers who had contact with Madera on July 5, 1982, including those who questioned the defendant when he gave his statement, testified as to his condition at that time. Assistant state's attorney John Connelly also testified.

The defendant admitted at the suppression hearing that he had been arrested on a number of occasions in the past in Connecticut and Massachusetts. He admit-

---

[17] During his testimony at the suppression hearing, Volkmar was asked the meaning of the various "Axis" designations in the "Final Diagnosis." He said: "Axis I is just a summary of psychiatric diagnosis other than so-called personality disorder diagnosis," that Axis 2 is a "personality disorder," that "Axis 3" has to do with physical ailments, that "Axis 4 has to do with the level of stress a person has been under in the past year" and that "Axis 5 has to do with their highest level of functioning in the past year."

ted that he had been arrested in Waterbury "on numerous occasions." His arrests included, he conceded, using a motor vehicle without permission, breach of the peace, breaking and entering with criminal intent,[18] violation of probation, assault in the third degree, interfering with a police officer, and assault on a police officer. In addition, he admitted that he had been arrested in Springfield for assault and armed robbery and for assault and battery on a police officer. There were also several other arrests. The trial court found that evidence had been adduced that Madera had been arrested in Connecticut and Massachusetts about seventeen times. Madera testified, however, that on none of these occasions was he advised of his rights by a police officer but that the "judge did it."[19]

We turn now to the defendant's motion to suppress which itself raises two basic questions: (1) whether his confession was made without a knowing, intelligent and voluntary waiver of his *Miranda* rights; and (2) whether his confession was involuntary.

At the outset, we are met with the defendant's claim that, on July 5, 1982, while in the custody of the police, he was never advised of his *Miranda* rights. This

[18] Madera admitted that he was sentenced in the Superior Court in Connecticut on this charge and that he was represented by a public defender at that time.

[19] After Madera admitted to these arrests, the following took place upon cross-examination by the state:

"Q. On none of those occasions, which I believe must be at least a dozen, did the police on one single occasion advise you of your rights?

"A. No. The judge did it.

"Q. The judge did it?

"A. Yeah, when I go in front of the judge.

"Q. When you went in front of the judge you were advised of your rights?

"A. Yes.

"Q. So you knew of your rights when the detectives came to speak to you after the fire on Prospect Street?

"A. Yeah."

threshold question, as did other later matters, involved questions of credibility. "The question of the credibility of witnesses is for the trier to determine. *State* v. *Johnson,* 162 Conn. 215, 226, 292 A.2d 903 [1972]. Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." *State* v. *Staples,* 175 Conn. 398, 407, 399 A.2d 1269 (1978). Moreover, " '[a] trier is certainly not required to believe testimony merely because it is not directly contradicted' . . . particularly in a criminal case." (Citation omitted.) *State* v. *Dudla,* 190 Conn. 1, 7, 458 A.2d 682 (1983). The trial court, in rejecting this claim, found that the "overwhelming evidence" was contrary to this claim of the defendant. In doing so, it specifically found credible the evidence that Madera was advised of his *Miranda* rights on July 5, 1982, by Officer Deeley at about 2:10 a.m., and again at about 6:15 a.m., by Lieutenant Solomita at about 9 a.m., again between 10 and 10:15 a.m. and again at about 8:05 p.m., and also by Officer Diaz shortly after 8:05 p.m., the latter doing so twice in Spanish. In reaching this conclusion, the court refers collectively to the testimony not only of Deeley, Solomita and Diaz, but also that of Connelly, Bochicchio and Bridges. In finding Madera's testimony on this matter "such an extreme exaggeration that it defie[d] credibility," it also referred to his testimony that although he had been arrested in Connecticut and Massachusetts "some seventeen different times, no policeman on any of .those arrests ever advised him of his rights." A careful examination of the record discloses that substantial evidence supports this finding.

Prior to our analysis on the basic issues, certain observations that will be implemented later deserve to be made at this point. The trial court, as already noted, had to resolve serious questions of credibility beyond

the threshold matter of whether Madera had ever been advised of his *Miranda* rights. First, the defendant has maintained that he is illiterate in both English and Spanish, and so, he contends, the normal assumption that may flow from a statement to which is appended his signature, i.e., that the signatory knows, understands and agrees with that statement, in this case the July 5, 1982 confession, cannot be made. Moreover, it is argued that he has difficulty communicating in English. In addition, he argues that much of the evidence adduced by him was unrebutted by the state including his long psychiatric history that "continued" to the time of his arrest and thereafter, his "incapacitating" seizure on the morning of July 5, 1982, in his cell, his intoxication on that date, and the paucity of medical evidence offered by the state. These matters are fraught with fact-bound determinations that the trial court was called upon to make, but, in doing so, it was not bound to accept testimony at face value merely because it might have been unrebutted. There were numerous conflicts in the evidence at the suppression hearing that it did have to resolve.

In making his claims that his confession was involuntary and that it was made without a knowing, intelligent and voluntary waiver of his *Miranda* rights, he relies on the same factual circumstances to support both of these claims.[20]

In claiming that his confession was involuntary, Madera maintains that the circumstances of his interrogation were coercive, that he had a history of psy-

---

[20] The defendant's brief asserts that he makes these two claims as being separate and distinct.

At the defendant's trial in 1987, his typewritten confession of July 5, 1982, was admitted into evidence as a full exhibit when Lieutenant Solomita was testifying for the state. At that time, the defendant objected to its admission, stating that he did so for all of the reasons given earlier at the suppression hearing. when he sought to have it suppressed.

chological disorders continuing up to and including the time of his arrest, that he was illiterate and intellectually incapable of making a voluntary confession, that he had suffered an "incapacitating seizure" on the day he confessed, and that he had been drinking heavily immediately before his arrest.

Turning to voluntariness, the use of an involuntary confession in a criminal trial is a violation of due process. *Mincey* v. *Arizona,* 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Miranda* v. *Arizona,* supra, 461–63; *State* v. *DeAngelis,* 200 Conn. 224, 232, 511 A.2d 310 (1986). The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Schroff,* 206 Conn. 182, 195, 536 A.2d 952 (1988). In *Schroff,* we said: " ' "We have stated that ' " 'the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . " *Rogers* v. *Richmond,* 365 U.S. 534, 544 [81 S. Ct. 735, 5 L. Ed. 2d 760] (1961).' " ' *State* v. *Staples,* [175 Conn. 398, 408, 399 A.2d 1269 (1978)]; see *State* v. *Derrico,* [181 Conn. 151, 163, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)]. 'The ultimate test remains . . . "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." ' *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) . . . . " *State* v. *Stankowski,* [184 Conn. 121, 132, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d

588 (1981)].' *State* v. *Derrico,* supra, 161. The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. *State* v. *Chung,* [202 Conn. 39, 48, 519 A.2d 1175 (1987)]; *State* v. *Carter,* 189 Conn. 611, 622, 458 A. 2d 369 (1983); *State* v. *Derrico,* supra, 165.

"This determination of voluntariness and admissibility, in the first instance, is a question of fact for the trial court to resolve in the exercise of a legal discretion in accordance with constitutional standards of due process. *State* v. *Derrico,* supra, 162–63. This, of course, includes decisions on questions of credibility presented to the trial court. *State* v. *McCarthy,* 197 Conn. 247, 258, 496 A.2d 513 (1985). 'Though the question is ultimately factual, our usual deference to fact-finding by the trial court is qualified on the question of voluntariness by the necessity for an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence.' *State* v. *Smith,* 200 Conn. 465, 478, 512 A.2d 189 (1986); *State* v. *Chung,* supra, 54." *State* v. *Schroff,* supra, 195–96; see *State* v. *Barrett,* 205 Conn. 437, 451–52, 534 A.2d 219 (1987); *State* v. *DeAngelis,* supra, 232–33.

Recently, in *State* v. *Gonzalez,* 206 Conn. 213, 221–22, 537 A.2d 460 (1988), we noted, quoting from *State* v. *Perry,* 195 Conn. 505, 516, 488 A.2d 1256 (1985), that: " 'The [traditional] test of voluntariness is whether an examination of all the circumstances shows that the conduct of police was such as to overbear the defendant's will to resist and bring about a confession, not freely self-determined.' " See *State* v. *Toste,* 198 Conn. 573, 584, 504 A.2d 1036 (1986). "The ultimate question of whether a defendant's will has been overborne, thus resulting in an involuntary statement in a particular case, involves, as noted, an assessment of the total-

ity of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. *Schneckloth* v. *Bustamonte,* supra, 226. Some of those also taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. Id.; *State* v. *Toste,* [supra]." *State* v. *Schroff,* supra, 201–202; see *State* v. *Wilson,* 183 Conn. 280, 439 A.2d 330 (1981). "The factors taken into account [on voluntariness] when assessing the totality of the circumstances include many of those used when determining the capacity of the defendant to waive his *Miranda* rights knowingly and intelligently." *State* v. *Toste,* supra; see *State* v. *Wilson,* supra, 285–86. In determining the factual circumstances involving such factors, the trial court also is to consider the psychological impact on an accused and evaluate the legal significance of how an accused reacted. *Schneckloth* v. *Bustamonte,* supra; *Culombe* v. *Connecticut,* 367 U.S. 568, 603, 81 S. Ct. 1860, 6 L Ed. 2d 1037 (1961).

The trial court carefully reviewed all of the relevant factors involved. It decided that "it would be pure speculation . . . to conclude that because of the defendant's prior history of seizures, alcohol abuse and therapy, [he] was unable to understand his rights on the evening of July 5, 1982." It not only found credible the testimony of Querijero, the emergency room physician, who concluded that the defendant was normal and healthy and who discharged him with no prescription for medication, but also that the defendant made no claim that he did not understand any question or statement of the officers other than the officers' questions and statements regarding his rights. In terms

of the claimed "incapacitating seizure," the trial court also had before it Querijero's testimony that if Madera had suffered a grand mal seizure in his cell[21] shortly before he was taken to the emergency room, he (Querijero) would "definitely" have found something, "some signs" of it, on his physical examination, and he did not find any such sign.

There is some reference made to the evidence that Madera had been drinking heavily up to the time of his arrest by Deeley. The use of drugs or the ingestion of alcoholic beverages does not, in and of itself, render a subsequent confession inadmissible, but it is one factor to be considered in judging the voluntariness of a statement. *State* v. *Stankowski,* supra, 134. The defendant argues that the evidence of his conduct during his final interrogation is testimony to "the debilitating effects of his seizure and his heavy drinking." Here, he points to the evidence that at that time his right leg shook "violently and uncontrollably" and to Diaz's testimony that Madera was less alert than in the fifteen years Diaz had known him. The defendant points out that his claim on this phase is not that his heavy drinking and seizure rendered him incapable of making a voluntary confession, but rather it was the "cumulative effect of these conditions, coupled with the circumstances of [his] interrogation, [his] history of mental illness, and his low levels of intellect and comprehension, that compels the conclusion that [his] confession was not a free and voluntary act." The trial court disagreed and we agree with the trial court. Its memorandum of decision refers to Deeley's testimony that

[21] Frederick Rosa, a state certified emergency medical technician, came to Madera's jail cell and was in the ambulance that then took him to the emergency room. Rosa, who had about seven years experience in these matters, said that Madera exhibited no sign of seizure. Rosa also said, on cross-examination by defense counsel, that when he went to the hospital with Madera, he told them "to examine for questionable seizure."

when he spoke to the defendant at 2:10 a.m., although he detected alcohol on Madera's breath, Madera did not appear to be drunk, his speech was not slurred and he walked with no difficulty. Deeley agreed that Madera was nervous, but, viewed in light of his approximately eighteen years experience as a police officer, Madera did not appear to be drunk. The trial court also observed that Querijero said that, although Madera had the odor of alcohol on his breath, he was not drunk or intoxicated, but was "nervous." Diaz, on cross-examination by defense counsel, testified that his impression was that Madera was "less alert" than he was in the prior fifteen years that he had known him, but, upon examination by the state, Diaz said that Madera was alert, that "he was nervous, but not overboard," and that he was shaking his leg. Moreover, Diaz also testified that Madera said that "[t]here's something I want to get off my chest." Diaz smelled no "liquor or anything from [Madera]."

The trial court also considered the defendant's educational level, noting that the evidence showed that, although he went through the eighth grade, he was functioning on a third grade level, but that he could write his name, could identify numbers and do some counting. There was evidence that Madera had an IQ of 83. The overall intelligence quotient of one making a voluntary confession is one factor to be considered, but it is not in and of itself, determinative. We so noted this in a related context in *State* v. *Hernandez,* 204 Conn. 377, 397, 528 A.2d 794 (1987), when we referred to such cases as *"People* v. *Watson,* [75 Cal. App. 3d 384, 396, 142 Cal. Rptr. 134 (1977)] (where confession from an accused with an IQ of 65 and signs of chronic brain damage and schizophrenia was admitted); *State* v. *Moss,* 7 Kan. App. 2d 215, 216–17, 640 P.2d 321 (1982) (63 IQ; eighth grade education); *Commonwealth* v. *White,* 362 Mass. 193, 196, 285 N.E.2d 110 (1972)

(low IQ, illiterate); *State* v. *Adkins,* 289 S.E.2d 720, 728 (W. Va. 1982) (49 IQ, moderate retardation)." We have also said that "the fact that [a] defendant was somewhat deficient in mental ability, had a psychiatric disorder, and was upset emotionally, [does not] necessarily render his statements inadmissible. *State* v. *Jones,* 193 Conn. 70, 84–85, 475 A.2d 1087 (1984); *State* v. *Poole,* [44 N.C. App. 242, 248, 261 S.E.2d 10 (1979)]." *State* v. *DeAngelis,* supra, 235.

With reference to the claim of illiteracy, we note that, while it is a factor to be considered, there is no requirement that a person be literate before his confession may be received into evidence. See *Berry* v. *State,* 399 So. 2d 354, 355 (Ala. Crim. App. 1981); *Carillo* v. *State,* 634 S.W.2d 21, 23 (Tex. Civ. App. 1982). The trial court, however, found, inter alia, that Madera was "bilingual" and that it was "significant" that the Whiting Forensic Institute record, compiled after July 5, 1982, showed that he has a "functional knowledge" of English. In addition, it points out that, at the suppression hearing, Madera "was able to recall and narrate in English his recollection of his activities on the night of the fire and his several conversations with various policemen, his interrogations and his denials about setting the fire." Further, it pointed out that the defendant "conceded" on cross-examination that a "lot of the information in [his typewritten and signed confession], other than the incriminating part, was given in response to questions by Solomita." The defendant, the trial court continued, made no claim that Solomita did not ask the questions that brought forth the incriminating answers, but that his claim was "that the statements [were] not his answers." Significantly, the trial court said that Madera "must concede that he has an understanding knowledge of the English language because this is the language that he elected to use in testifying at the hearing . . . ."

While pointing out that the evidence showed that Madera could not read or write, the trial court addressed the "patient efforts" of the interrogator to assist the defendant with reading and writing difficulties. It indicated that the testimony of all of the police officers and Connelly was that the defendant's *Miranda* rights were read and "carefully explained" to him and that before questioning by Deeley and Solomita these officers were "assured" by Madera's responses to their inquiries that he understood his rights. This was specifically determined to be so prior to allowing Madera to make the typewritten statement on the evening of July 5, 1982. The court properly concluded that phase of its discussion, observing that "[t]he officers could hardly have been more patient and meticulous about assisting the defendant in understanding his rights . . . ." Importantly, the trial court also determined that there was "no substantial credible evidence" that Madera's physical or mental condition was impaired when his rights were read and explained to him prior to his written statement.

Further, Madera's prior exposure to the criminal justice system, due to some seventeen prior arrests, and earlier experience with both the police and the courts were also noted, especially with reference to his knowledge of his rights. This prior experience also is relevant to the defendant's claim of police coercion in obtaining the confession. The fact that Madera gave his confession while in police custody in jail must certainly be considered.

The police tactics in this case were not coercive or overreaching, either when considered independently or collectively with all the circumstances. See generally *Colorado* v. *Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). The defendant had been in police custody in jail for about eighteen hours when he made his typewritten statement. Prior to beginning his state-

ment on July 5, 1982, at 8:27 p.m., he had been questioned earlier that day by Deeley at 6:15 a.m. "for just a few minutes," by Solomita at about 9 a.m. for "about five minutes" and again by Solomita at about 10:15 a.m. for a short time. Thereafter, he spent the remainder of the day in his cell either sitting on his bed or sleeping. He was provided with food at noon and between 5 and 7 p.m. About 8:05 p.m., he was brought to an interrogation room where he was questioned and gave his statement that concluded at 9:27 p.m.— approximately one and one-half hours. There is no claim in this case of rough language, physical abuse, threats, promises or inducements. There is no evidence that he was tired or asked that the questioning end. See *Vance v. Bordenkircher,* 692 F.2d 978, 981 (4th Cir. 1982), cert. denied, 464 U.S. 833, 104 S. Ct. 114, 78 L. Ed. 2d 114 (1983). Actually, the trial court found that there was "no evidence of any extended or abusive treatment,"[22] but, rather, after the careful explanation of his rights, it found that there was "unequivocal testimony" that Madera "expressly stated that he wanted to talk and get the matter off of his chest." In a broader statement, it found that his "waiver of rights *and*

---

[22] The defendant, in his brief and at oral argument, placed great stress on *Blackburn* v. *Alabama,* 361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960), in claiming that his confession was involuntary. That reliance is misplaced; *Blackburn* is simply not this case.

In *Blackburn,* the court found that Blackburn was probably insane at the time of his confession and that the police learned during their interrogation that he had a long history of mental problems. They exploited this weakness with coercive tactics such as the eight-to-nine hour sustained interrogation in a tiny room, which, on occasion, was literally filled with police and that the confession was composed by the deputy sheriff and not Blackburn. Id., 207–208; see *Colorado* v. *Connelly,* 479 U.S. 157, 163–64 n.1, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

The defendant also refers several times to *Culombe* v. *Connecticut,* 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961), on the issue of voluntariness. *Culombe* is inapposite; in that case, the defendant was held for five days of repeated questioning during which the police employed coercive tactics.

agreement to talk was voluntary since there is no evidence that the defendant was in any way threatened, intimidated, coerced or abused." (Emphasis added.) Despite the defendant's claim to the contrary, Madera was not coerced.

The trial court's conclusion that Madera's confession of July 5, 1982, was voluntary is supported by the record, and his federal constitutional claim to the contrary must be rejected.[23] There is no "persuasive evidence" of involuntariness in this record. See generally *State* v. *Gonzalez,* supra, 222; *State* v. *Barrett,* supra, 452; *State* v. *Wilson,* supra.

We next take up the defendant's claim that he did not knowingly, intelligently and voluntarily waive his *Miranda* rights. The trial court found, on the basis of the credible evidence and the law, that the state had discharged its burden of proving a valid waiver of *Miranda* rights. After a careful examination of the record, we agree.

In making this claim, the defendant argues that we consider it independently under our state constitution and do so with reference to all of the circumstances of this case. We do not have to reach and decide his

---

[23] We need not address the defendant's state constitutional claim, in which he maintains that after *Colorado* v. *Connelly,* 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), there is a distinction between the federal and state constitutional standards. See Conn. Const., art. I, § 8. In that regard, he urges this court "to consider the totality of the circumstances surrounding [his] interrogation in considering the voluntariness of his statements to the police *and* the validity of his alleged *Miranda* waivers, rather than narrowly focusing on the presence or absence of 'police coercion.' (Emphasis added.) We need not address his state constitutional claim because, on the voluntariness issue itself, the trial court clearly applied the favorable pre-*Connelly* totality of the circumstances analysis. In addition, we have no occasion even to consider extending this distinction proffered by the defendant on state constitutional grounds to our analysis of the claimed waiver of his *Miranda* rights as in this case because there, too, the trial court also employed the favorable pre-*Connelly* totality of the circumstances analysis.

claim on state constitutional grounds because the trial court's conclusion on this issue was made on "the basis of all the evidence," a pre-*Connelly* standard that was more favorable to the defendant. In contending that the state did not sustain its burden on waiver, Madera incorporates all of his claims made earlier on the voluntariness issue, including his lack of education and history of psychological problems. He also incorporates the claims of his inability, because of his overall condition, knowingly and intelligently to make a valid waiver. He particularly attacks what he characterizes as "discrepancies" in the testimony of Solomita, Diaz and Connelly as casting doubt on the validity of the *Miranda* waiver prior to giving his typewritten confession of July 5, 1982.

"The purpose of *Miranda* warnings is to assure that a confession is ' "the product of an essentially free and unconstrained choice by its maker." ' *State* v. *Derrico,* [supra, 163], quoting *Culombe* v. *Connecticut,* [supra, 602]." *State* v. *Burge,* 195 Conn. 232, 247, 487 A.2d 532 (1985). Waiver has been defined as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). " '[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights . . . 'do not presume acquiescence in the loss of fundamental rights.' " Id.; *State* v. *Shockley,* 188 Conn. 697, 707, 453 A.2d 441 (1982). "An effective waiver presupposes full knowledge of the right or privilege allegedly waived and some act 'done designedly or knowingly to relinquish it.' " *State* v. *Ramos,* 201 Conn. 598, 603, 519 A.2d 9 (1986); *State* v. *Toste,* supra, 630. "The courts must presume that [the] defendant did not waive his rights; the prosecution's burden is great . . . . " *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Wilson,* supra, 284. "Although

the issue is . . . ultimately factual, our usual defer-ence to factfinding by the trial court is qualified, on questions of this nature, by the necessity for a scrupu-lous examination of the record to ascertain whether such a factual finding is supported by substantial evi-dence. *State* v. *Frazier,* [185 Conn. 211, 219, 440 A.2d 916 (1981)]." *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983); *State* v. *Chung,* supra, 48–49; *State* v. *Wilson,* supra, 286. The burden upon the state to prove a valid waiver of *Miranda* rights is proof by a fair preponderance of the evidence and not proof beyond a reasonable doubt. *Lego* v. *Twomey,* supra; *State* v. *Wilson,* supra, 287; *State* v. *Derrico,* supra, 162. In considering the validity of this waiver, we look, as did the trial court, to the totality of the cir-cumstances of the claimed waiver. See *State* v. *Chung,* supra, 48; *State* v. *Simms,* 201 Conn. 395, 415, 518 A.2d 35 (1986).

Initially, we point out that it is clear that the trial court considered the totality of the circumstances in resolving the issue of the *Miranda* waiver. We also note that the trial court determined that, because of the "overwhelming" evidence to the contrary, the defend-ant's claim that he did not "understand his *Miranda* rights must fail." Its finding of a valid waiver of *Miranda* rights discloses that it was required to resolve, as was its function, questions of credibility in this mat-ter.[24] It specifically referred again to the giving of his rights by Deeley and Solomita, as well as its finding that he understood them. The trial court correctly fac-

---

[24] The defendant's claim that the state failed to sustain its "burden of proving that [he] made a valid waiver of his *Miranda* rights before con-fessing his role in the fatal fire" includes alleged "discrepancies" in the testimony of the three persons present at the time of his confession—Assistant State's Attorney Connelly, Lieutenant Solomita and Officer Diaz. He maintains that these witnesses "could not agree on a consistent ver-

tored into its determination of the *Miranda* issue that there was "no evidence that the defendant was in any way threatened, intimidated, coerced or abused." In addition to this, the trial court referred to Madera's admission that he placed his signature, the date and the time on the police blue *Miranda* warning card, as well as his initials after each of the enumerated *Miranda* rights on the typewritten confession. The trial court said that "all [the circumstances] combined with the unequivocal testimony that [Madera had] expressly stated that he wanted to talk and get the matter off of his chest, [would leave] the court . . . hard pressed to not find that [Madera] knowingly, intelligently and voluntarily waived his rights prior to making the statements set forth in [the typewritten confession]." "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Oregon* v. *Elstad,* 470 U.S. 298, 318, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

In deciding that there was a valid *Miranda* waiver, the trial court went on and explicitly disposed of the defendant's claim that "he was incapable of understanding and waiving his rights because of his past medical and psychiatric history, his lack of high intelligence and inability to read and write, his record of alcohol abuse and generous consumption of alcohol on the night of the fire, [which the defendant] contends all rendered him vulnerable to suggestions by the police and caused him to not be capable of understanding and waiving his rights." In doing so, it concluded that there "is no evidence of any cause and effect relationship between

sion of the critical sequence of events leading up to [his] signing of the confession."

The requisite examination of the record discloses that inconsistencies, if any, were resolved by the trial judge. There was, in any event, considering the totality of the circumstances, substantial evidence that supports the trial court's conclusion of a valid *Miranda* waiver.

[the] defendant's *claimed deficits* and his ability to understand and waive his *Miranda* rights on the evening of July 5, 1982." (Emphasis added.)

A scrupulous examination of the record reveals that the trial court's factfinding on this issue is supported by substantial evidence. It thus applied the law correctly in concluding that there was a knowing, intelligent and voluntary waiver by the defendant of his *Miranda* rights.

There is no error.

In this opinion the other justices concurred.