[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above-named defendant, has filed motions to suppress his written confession as well as items seized as the result of a warantless search of a motor vehicle. The defendant alleges that the warantless search and seizure of items from his automobile violated his State and Federal Constitutional rights against unreasonable search and seizure. The defendant also alleges that his confession, given to state police officers subsequent to his arrest, should be suppressed because it resulted from the illegal seizure of items from his motor vehicle. In addition, the defendant claims that said confession was obtained by physical violence, threats and coercion. CT Page 14076
A hearing was held on the defendant's motions to suppress on September 30, 1999. At that hearing testimony was received from Connecticut State Police Troopers Reidy, Foley, Lombardo and Shaw, as well as from the defendant, the defendant's mother, Sandra Driver, and the defendant's girlfriend, Nilda Markowitz. After weighing the testimony of the witnesses, assessing their credibility, and considering the exhibits admitted into evidence, the court finds the following facts to have been proven.
FACTUAL FINDINGS:
At approximately 3:30 a.m. on June 8, 1999, Trooper Robert Lombardo, a five-year veteran of the Connecticut State Police Department, was dispatched to investigate a 911 call alleging that the defendant, Alexander Nieves, had threatened to go to his girlfriend's house in Stafford and shoot her and himself with a .9 mm pistol. At the same time, Trooper Lombardo was also made aware that Nieves was wanted by another police department. Upon his arrival at the house Lombardo was told that Nieves had fled into the woods. Because it was dark, and because the defendant was presumed to be armed, additional troopers were called and they secured the perimeter of the area and began a search for Nieves with a K-9 unit. The search, which lasted for about three hours, was unsuccessful and was called off at approximately 6:30 a.m.
At approximately that time, Trooper Lombardo was assigned to take statements from the witnesses, and to determine the owner of the vehicle Nieves had left at the scene. In order to do so, Lombardo needed to obtain the vehicle identification number (VIN) and registration of the vehicle. It was daylight when he went to the car to obtain the registration and VI, and as he looked in the passenger side window of the car he observed in plain view numerous car radios and CD players on the back seat and floor of the vehicle. The items were not in boxes and some radios had wires hanging out of them which is consistent with the radios having been removed from a motor vehicle. Lombardo was also able to see that the brand name of at least one radio was COBRA. At roll call the previous evening information was given to Trooper Lombardo that there had been a number of recent automobile burglaries in the area and that radios and CD players had been stolen from these vehicles. The brand name of some of those radios was COBRA. Believing that the radios and CD players were probably stolen, Lombardo entered the passenger portion of the car, which was unlocked, and seized the items. CT Page 14077
Mr. Nieves testified that the radios were in the trunk of the vehicle, not in the passenger compartment. Trooper Lombardo testified that nothing was found in or seized from the trunk. The court finds Trooper Lombardo's testimony to be credible as to this matter. The radios and CD players were subsequently identified as having been stolen from vehicles in the area.
Ms. Markowitz testified that the troopers conducting the initial search for Nieves at approximately 4:00 a.m. looked into both the passenger compartment and the trunk of the vehicle. Given the circumstances that existed at the time it is logical to infer that the troopers were eliminating the possibility that Nieves was hiding in the car, not looking for stolen items. Trooper Lombardo testified that the troopers who looked through the car had secured the vehicle, but it is noteworthy that when he looked into the vehicle at 6:30 it was unlocked. It is reasonable to infer that when Trooper Lombardo testified that the vehicle had been secured by the other troopers he meant that no one was located in the vehicle. There is no evidence that the troopers who "secured" the vehicle saw contraband or anything suspicious in the vehicle.
Also at approximately 6:30 a.m. on June 8, 1997, Trooper James Reidy, a 15-year veteran of the Connecticut State Police Department, was en route to the Troop C Barracks to begin his work shift when he was directed by radio to respond to the Stafford location. Trooper Reidy was advised that the incident involved a complaint that an individual had made a call to his girlfriend that he intended to kill her and himself with a .9 mm pistol. He was also made aware that troopers and a K-9 unit had been searching for the suspect during the night.
As Reidy arrived at the scene, a male came out of the house and pointed toward a wooded area away from the house. Trooper Reidy looked in that direction and briefly saw someone running around a parked recreational camp trailer. Reidy gave chase and lost sight of the individual. After a brief search he tried the door to the trailer and found it to be locked. While he was leaning against the trailer he felt the trailer move and immediately realized that someone was inside. At about this time Trooper Michael Foley, a six-year veteran of the Connecticut State Police Department arrived on the scene. Trooper Reidy instructed Trooper Foley to get the keys to the trailer from the home owner. Subsequently, the troopers unlocked and entered the CT Page 14078 trailer with their weapons drawn as the initial complaint included a threat involving a firearm.
After calling for the defendant to surrender without success, the troopers began a search of the trailer which resulted in discovering the defendant, Alexander Nieves, hiding under a bed. They ordered Nieves to get up slowly and show them his hands. He refused to do either. Trooper Reidy grabbed the defendant's legs and pulled him out from under the bed. After some minor resistance the defendant was handcuffed and removed from the trailer. No gun was found at the scene.
Nieves claims that after being handcuffed, and while in the trailer, he was beaten by four or five state troopers over a period of several minutes. He claims that the troopers beat him on his back and legs with batons or billy clubs or something similarly hard. Reidy and Foley testified that other than pulling Nieves from under the bed and forcing his arms into a position where he could be handcuffed there was no physical violence on the part of Nieves or any of the troopers. The troopers testified that they did not have batons or billy clubs and denied that they or any other trooper struck Nieves at any time. With the exception of which of the two troopers entered the trailer first, Trooper Foley's testimony mirrored that of Trooper Reidy.
Trooper Lombardo testified that he had left the scene prior to the arrival of Trooper Reidy and was ordered back to the scene when Nieves was discovered. He observed Nieves after he had been taken into custody and saw some scrapes and scratches on his face, hands and legs but no indication that he had been struck or beaten. He testified that the scratches and scrapes that he observed were consistent with running through the woods at night. Lombardo stated that on other occasions he himself had suffered similar scratches after tracking suspects through wooded areas. A photograph taken of Mr. Nieves head and face at the state police barracks on the morning of his arrest does not reveal any unusual marks, scratches of bruises. (Exhibit D) No medical evidence was presented to corroborate the defendant's claims. The court finds the testimony of the officers to be credible as to this matter. The court does not find any credible evidence to support the claim of the defendant that he was physically assaulted and/or beaten by the officers.
Nieves also testified that he had been "drinking and drugging" during the night of June 7-8, 1997 and that he was CT Page 14079 intoxicated and in a blackout on the early morning of June 8th. Ms. Markowitz, who was the subject of the alleged telephone threat from the defendant, testified that when the defendant called her during the early morning hours of June 8, 1997 he sounded as though he was under the influence. However, other than seeing the defendant from a distance after he was taken into custody, she never saw nor came into contact with Nieves that day. The defendant's mother testified that Nieves used her car on the night of the incident and that when it was returned to her if contained numerous empty and partially empty beer and alcohol bottles which were not present before he took the car. However, she did not see the defendant after he left her residence on the night of the incident.
None of the troopers who interacted with or observed Nieves smelled any alcohol on his breath and none believed that he was intoxicated or under the influence. Trooper Reidy, who arrested, transported and questioned Nieves testified that the defendant was dirty, sweaty and tired, but that he did not smell of alcohol nor appear to be intoxicated. Reidy testified that with the exception of yelling at his girlfriend who was in the house as he was being placed in the cruiser, Nieves was rational, coherent, and calm. The court finds the testimony of the officers to be credible as to this matter. The court finds no credible evidence that Nieves was intoxicated or under the influence on the date in question.
After Mr. Nieves was arrested, Trooper Reidy placed the defendant in his police cruiser and read his Miranda rights from a card that he kept in the cruiser. Nieves appeared to understand his rights. The defendant was then transported to the Troop C barracks where he was processed. At 7:45 a.m. Trooper Reidy again advised the defendant of his Miranda rights using two separate advisement of rights forms. (Exhibits A and B) Reidy began by having the defendant read out loud a portion of the writing on one of the forms and then asked if he understood what he read. The defendant indicated that he did understand. Reidy then went over the waiver of rights form and had the defendant read the advisement of rights forms, one of which is written in both English and in Spanish, after which Reidy read the advisement of rights from the form to the defendant. Mr. Nieves stated that he understood his rights and he signed and initialed both forms in the applicable places. Trooper Reidy also signed both forms. Reidy testified that Nieves did not have any trouble understanding English. The court came to the same conclusion at CT Page 14080 the time of the hearing.
Before taking the defendant's statement Reidy had the defendant read the warning at the top of the statement form. During the next fifty minutes they discussed the content of the statement and Reidy wrote down what Nieves stated to him. After the document was written by Reidy, he had the defendant read each of the three pages of the statement and sign the bottom of each page. Reidy also signed the bottom of each page. (Exhibit C) The entire process lasted from 8:00 a.m. until 8:50 a.m.
Mr. Nieves testified that he has been arrested approximately eighteen times and that he had been given his Miranda rights on those prior occasions. He testified that he understood his rights and he admitted that he is familiar with the police procedures following an arrest. He stated that following some of the prior arrests he gave statements to the police when he thought it would help him and refused to do so on other occasions. On this occasion, Nieves testified that he was given his Miranda rights and that he "voluntarily" gave a written statement to Reidy when requested to do so. He said that he did so because he thought that he would be beaten again if he did not. He admitted that no one actually threatened him with violence or any harm if he did not give a statement. He admitted that he was fully aware of his Constitutional rights and he knew that he could refuse to give a statement.
Mr. Nieves now claims that although he voluntarily signed all three pages of the statement that he gave to Trooper Reidy on the morning of June 8, 1997, the paragraph beginning at the bottom of page 2 and ending at the top of page 3 was not in the written statement when he signed the document. Reidy testified that the content of the statement, including the last paragraph, is exactly as told to him by Nieves, including the defendant's complaint within the statement that the troopers had beaten him in the trailer. Reidy stated that it was Nieves' statement and that he could put whatever he wanted in his statement. The court finds no evidence to support the defendant's allegation. This is basically a matter of credibility and as to this issue the court finds the testimony of Trooper Reidy to be credible.
On the afternoon of June 8, 1997, Trooper Harry Shaw met with Mr. Nieves at the Troop C Barracks and asked if Nieves would talk with him. Nieves agreed and Shaw met with him in an interview room, advised him of his Miranda rights. He had Nieves read out CT Page 14081 loud the top portion of the waiver of rights form, and asked Nieves about his education and whether he understood English. Shaw was satisfied that Nieves understood English and understood the rights he was giving up by talking with him. Shaw testified that Nieves did not appear to be under the influence and that he was coherent. Both Nieves and Shaw signed the waiver of rights form (Exhibit E) after which Shaw and began to question Nieves about motor vehicle burglaries in the Stafford area.
Nieves refused to give Trooper Shaw a written statement, but he did agree to speak with Shaw about his activities in the area. Following the interview, which lasted for about one hour, Shaw checked on some of the information Nieves had given him. Finding several significant inconsistencies, Shaw again spoke with Nieves on the same afternoon of June 8th and asked him about the inconsistencies. At that point Nieves stated that he did not want to talk with Shaw any longer and Trooper Shaw immediately terminated the interview.
WARRENTLESS SEARCH AND SEIZURE:
The justification for the so-called "automobile exception" is twofold: (1) the inherent mobility of an automobile creates "exigent circumstances"; and (2) the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. California v. Carney,471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); South Dakota v.Opperman, supra, 367; Chambers v. Maroney, 399 U.S. 42,90 S.Ct. 1975, 26 L.Ed.2d 419, reh. denied, 400 U.S. 856, 91 S.Ct. 23,27 L.Ed.2d 94 (1970); Carroll v. United States, 267 U.S. 132, 153,45 S.Ct. 280, 69 L.Ed 543 (1925); State v. Kolinsky182 Conn. 533, 538, 438 A.2d 762 (1980), cert. denied, 451 U.S. 973,101 S.Ct. 2054, 68 L.Ed.2d 354 (1981). The police officers must have probable cause to believe that the vehicle contains contraband,Carroll v. United States, supra, 153-54, and the probable cause determination must be based on objective facts that could have justified the issuance of a warrant by a neutral magistrate at the time the search was made. United States v. Ross, supra, 808.
"Probable cause to search exists if (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched." (Emphasis in original; citations CT Page 14082 omitted.) State v. DeChamplain, [179 Conn. 522, 528-29,427 A.2d 1338 (1980)]. State v. Delmonaco, 194 Conn. 331, 337,481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401(1984). State v. Badgett, 200 Conn. 412, 428-429, cert. denied,479 U.S. 940, 107 S.Ct. 473, 93 L.Ed.2d 373 (1986).
The court finds that the officer had a legally legitimate reason for investigating the automobile and thus his observation of the items in the car was lawful under the circumstances of this case. State v. Badgett, supra. Leaving stolen radios in plain view on the back seat and floor of the automobile was inconsistent with any reasonable expectation of privacy. Anyone looking through the window would have seen the items and recognized them for what they were. Based upon his plain view observation of the number, location, and condition of the radios and CD players in the back seat of the automobile, coupled with the information that he possessed at the time regarding recently stolen radios and CD players from vehicles in the area, the court finds that Trooper Lombardo had probable cause to believe that the items which he observed in the car were stolen.
The court finds that considering the totality of the circumstances as they existed at the time, including mobility of the automobile and the fact that Mr. Nieves had not yet been apprehended and thus could have returned to the vehicle, Trooper Lombardo's decision to immediately seize the items that he observed, and which he reasonably believed to have been stolen, was reasonable, prudent, and justified as a motor vehicle exception to the warrant requirement.
CONFESSION:
It is the State's burden to prove by a fair preponderance of evidence that a defendant's confession or incriminating statements made while said individual was in custody were voluntary. The test of voluntariness is "whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." (Internal quotation marks omitted) State v. Madera,210 Conn. 22, 39 (1989). Before the State may seek to use a confession or incriminating statements obtained from a custodial defendant in a criminal proceeding, it must prove by a fair preponderance of evidence that the defendant was given the Miranda warning against self incrimination and the assistance of CT Page 14083 counsel, and that he voluntarily, knowingly and intelligently waived those rights. "To be valid, a waiver must be voluntary, knowing and intelligent." Miranda v. Arizona, 384 U.S. 436, 475,487, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) State v. Stanley,223 Conn. 674 (1992).
Based upon its factual findings, and the totality of the circumstances concerning this case, as discussed above, the court finds by more than a preponderance of the evidence that the defendant knowingly and voluntarily waived his Constitutional rights to remain silent and to consult with an attorney before giving Trooper Reidy an incriminating written statement and Trooper Shaw an incriminating verbal statement. There is no credible evidence that the defendant's will to resist was in any way overborne by any actions of the law enforcement officials, or that he was coerced, threatened or forced in any way to give a statement. There is substantial credible evidence that the defendant was given his Miranda warnings on at least three occasions on the date in question and that he fully understood the rights which he voluntarily waived and invoked at separate times during the day.
The motions to suppress are denied.
Terence A. Sullivan, J. Superior Court Judge