******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* TONY M.*
## (SC 19934)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of murder and risk of injury to a child in connection with the death of his seven month old baby, the defendant appealed, claiming that the trial court improperly denied his motion to suppress certain evidence arising from statements that he had made to the police and improperly excluded a letter to the state in which he offered to plead guilty to the charge of manslaughter. The defendant's conviction stemmed from an incident in which he threw the baby off a bridge and into a river. On his way to the bridge, the defendant had a text message exchange with the baby's mother, with whom he had a troubled relationship and shared custody of the baby, stating, inter alia, "[y]ou won't talk to me tomorrow or any other day," "[t]here [are] no more days," "[e]njoy your new life without us," and that he would not be delivering the baby to her on her next scheduled day of custody. After the defendant arrived at the bridge, he called his own mother and told her to "tell everyone I'm sorry." A few minutes later, the defendant wrote and deleted a message on his phone stating "[t]o everyone, I'm sorry." The defendant then sent additional text messages to the baby's mother stating, inter alia, "[e]njoy your life without us now," "[you're] not a parent anymore," and "[the baby is] dead . . . ." The police arrived at the bridge and discovered the defendant there alone. When the police approached the defendant, he jumped from the bridge into the river. After the defendant was rescued, he was transported to a hospital, where the police subsequently interviewed him for approximately thirty-five minutes. Seven minutes of that interview were video recorded, and, during that time, the defendant responded to questions with only silence, brief verbal answers, shrugs, nods, or shakes of his head. A police officer, using a basketball analogy, asked the defendant whether the baby's trajectory off the bridge was more like a half-court shot, a three pointer, or a free throw. The defendant responded by saying "free throw." Before trial, defense counsel sent a letter to the state indicating that the defendant was willing to plead guilty to manslaughter in exchange for a sentence of twenty-five years imprisonment. The state rejected that offer, and defense counsel subsequently made an oral motion seeking to introduce that letter into evidence, claiming that the defendant's offer was a conclusive admission that he accepted criminal responsibility for the death of the baby but with the mental state associated with manslaughter. The trial court ultimately excluded that letter from evidence, concluding that it was irrelevant and would raise unnecessary collateral issues. The defendant also filed a motion to suppress evidence relating to the hospital interview, including the defendant's "free throw" statement and testimony by the police officers conducting the interview that the defendant had not asked about the baby's welfare during the interview. The defendant claimed, inter alia, that any waiver of his rights under *Miranda* v. *Arizona* (384 U.S. 436) was involuntary and that any statements made during the interview were inadmissible pursuant to the statute (§ 54-1o) governing the admissibility of statements made in the course of an unrecorded custodial interrogation by the police at a place of detention. The court denied the defendant's motion to suppress, concluding that he had voluntarily waived his *Miranda* rights and that his statements to the police had been voluntary. On appeal from the judgment of conviction, *held*:

1. The defendant could not prevail on his claim that the trial court improperly denied his motion to suppress because, even if the challenged evidence had been improperly admitted, any such error was harmless: the state satisfied its burden of proving that any error in admitting the challenged evidence was harmless beyond a reasonable doubt, as that evidence, which was cumulative of other evidence and was not highlighted by the state, was inconsequential in light of overwhelming, independent

evidence of the defendant's intent to kill the baby, including, inter alia, the text messages he sent to the baby's mother and statements he made to his own mother, the deleted message, testimony by a psychiatry resident that the defendant had told him in an interview conducted shortly after the hospital interview that the defendant told her that he had intended to take the baby's life, and the defendant's own testimony that he brought the baby to the bridge with the intention of committing suicide; moreover, even if the police had violated § 54-1o by failing to record portions of the hospital interview, the defendant failed to meet his burden of proving that the admission of the challenged evidence substantially affected the verdict in light of the same overwhelming, independent evidence of his intent to kill the baby.

2. The trial court did not abuse its discretion in excluding from evidence the letter containing the defendant's plea offer: the trial court correctly concluded that the defendant's offer to plead guilty to the lesser offense of manslaughter, a tactical decision made before trial, was irrelevant to the issue of whether the defendant intended to kill the baby when he committed the charged crimes, the only contested issue at trial for the jury to consider; moreover, in light of the infinitely variable and complex considerations involved in plea bargaining, such evidence could inject collateral issues that could have confused the jury.

Argued January 17—officially released August 27, 2019

*Procedural History*

Amended information charging the defendant with the crimes of murder and risk of injury to a child, brought to the Superior Court in the judicial district of Middlesex, where the court, *Vitale, J.*, denied the defendant's motions to preclude and to admit certain evidence; thereafter, the case was tried to the jury before *Vitale, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed*.

*Norman A. Pattis*, with whom, on the brief, was *Brittany Paz*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, *Peter A. McShane*, former state's attorney, and *Eugene R. Calistro, Jr.*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Tony M., appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant makes three claims. First, he claims that the trial court improperly denied his motion to suppress certain evidence arising from statements that he had made to the police while in the hospital on the ground that any waiver of his *Miranda*[1] rights prior to making those statements was involuntary. In connection with that claim, he argues that his statements were made involuntarily due to his weakened physical condition at the time he made them. Second, he claims that evidence regarding his statements was also inadmissible because the interview was not recorded, as required by General Statutes § 54-1o. Third, he claims that the trial court improperly precluded him from introducing into evidence a letter in which he offered to plead guilty to manslaughter in exchange for twenty-five years incarceration. We disagree with the defendant's claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. On July 5, 2015, the defendant threw the victim, his seven month old baby, from the Arrigoni Bridge into the Connecticut River in Middletown. The defendant then jumped off the bridge himself. The defendant survived the fall; the baby did not. In the weeks leading up to the murder, the defendant's relationship with the baby's mother became increasingly troubled, and they separated. As a result, the baby's mother decided to move out of the house where they had been living together for almost two years. At the same time, the baby's mother applied for, and was granted, a temporary restraining order against the defendant. In her application, she explained that the defendant had told her that he could make her and the baby disappear at any time. This caused her to fear for the safety of herself and the baby. At a subsequent hearing, on June 29, 2015, the court dissolved the temporary restraining order, and the defendant and the mother reached an agreement to share joint legal custody of their baby.

Within days of this agreement, on July 5, 2015, the defendant had custody of the baby at his mother's house, where he lived. At around 11 p.m., the defendant woke the baby from his sleep, put him in the stroller along with some blankets, a pacifier, his phone, an iPod, and a knife, and went for a walk. He soon began walking toward the Arrigoni Bridge with the intention of killing his baby and committing suicide. En route to the bridge, the defendant initiated the following exchange of text messages with the baby's mother:

"[The Defendant]: I hope you had fun bullshitting, I really needed to talk to you . . . .

"[The Baby's Mother]: I was trying to talk to my friend. She just broke up with her boyfriend and wanted to talk to me. Sorry I'm trying to be a good friend . . . .

"[The Defendant]: Well, I'm sorry there was a problem regarding our son . . . .

"[The Baby's Mother]: What's going on . . . . Why didn't you say that instead of saying I need to talk to you.

"[The Defendant]: Clearly nothing that matters to you. And why would I say I NEED to talk to you if it wasn't important . . . .

"[The Baby's Mother]: What was the matter?

"[The Defendant]: Don't worry, you'll see later. Just remember I tried [to] contact you first . . . .

"[The Baby's Mother]: Just tell me! Are you in the hospital?

"[The Defendant]: No, and again it doesn't matter now. Just remember you wanted to play games and lie and be childish when I tried to reach out . . . .

"[The Baby's Mother]: Okay Tony. Good night I'll talk to you tomorrow or Tuesday . . . .

"[The Defendant]: No you won't . . . .

"[The Baby's Mother]: What do you mean no?!

"[The Defendant]: You won't talk to me tomorrow or any other day . . . .

"[The Baby's Mother]: Tuesday is my day. So yes I'll text you in the morning to see when you'll be dropping off [the baby].

"[The Defendant]: I won't be . . . .

"[The Baby's Mother]: Tuesday is my day.

"[The Defendant]: There is no more days . . . .

"[The Baby's Mother]: Wtf you mean?!

"[The Defendant]: Enjoy your new life without us . . . .

"[The Baby's Mother]: You can't just decide not to bring him back . . . . It says in the agreement that Tuesday is my day. You can't just not bring him! Tony!!!! Seriously. Don't play around like that. Please don't try and take him from me!!!!"

During the course of this exchange, the defendant arrived at the bridge with the baby. Shortly thereafter, he called his own mother, told her where he was, and began crying. While on the phone with the defendant, his mother could hear the baby cooing and then briefly crying in the background. Assuming the defendant was going to jump from the bridge, his mother pleaded with

him to walk away. He responded that he couldn't and told her to "tell everyone I'm sorry." He then asked her to come to the bridge to get the stroller, iPhone, and iPod so that she would have pictures of the baby. He did not ask her to come get the baby. His mother and brother immediately drove to the bridge, calling the police on the way. Around this same time, a witness drove over the bridge on the way home from work. That witness saw the defendant holding the baby out in front of him and walking toward the railing. A few minutes later, the defendant wrote and deleted a message in his phone that stated: "To everyone, I'm sorry."

The defendant resumed exchanging text messages with the baby's mother:

"[The Defendant]: You tried to take him away from me. You failed. I didn't . . . . Enjoy your life without us now . . . .

"[The Baby's Mother]: Where are you . . . I'm trying to make this co-parent thing work!

"[The Defendant]: Your not a parent anymore . . . .

"[The Baby's Mother]: I'm trying to get along with you for [the baby] and [you] do this?! You can't just up and leave with [the baby]. Where are you! Where's [the baby]?

"[The Defendant]: He's dead . . . [a]nd soon I will be too . . . .

"[The Baby's Mother]: Don't [say] that!!!! Your playing right now! Please tell me you're kidding!!!!!!!!! You're fucking kidding me!!!!!! Don't fucking talk like that . . . . You couldn't kill your own son! [P]lease don't hurt [the baby]!!! Please!!!!!!!!!"

At that point, police officers and the defendant's mother arrived at the bridge where they saw the defendant but not the baby. As officers approached the defendant, he threw himself over the railing and into the Connecticut River. The fall did not kill the defendant. He proceeded to wade in the water for approximately twenty minutes before being rescued. Shortly thereafter, he was airlifted to Hartford Hospital where he was placed in the intensive care unit. Two days later, the baby's body was found in the river by a kayaker.

The defendant was arrested and charged with murder and risk of injury to a child. At trial, the defendant testified that he was responsible for his baby's death but claimed that he had accidentally dropped him from the bridge. Thus, the only question before the jury was whether the defendant intended to kill the baby. Following a weeklong trial, the jury returned a verdict, finding the defendant guilty on both charges. The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of seventy years of incarceration. This appeal followed.[2] Additional relevant facts will be set forth as necessary.

## I

The defendant claims that the trial court improperly denied his motion to suppress evidence regarding certain statements that he made to the police while in the hospital. In particular, he claims that any statements made while he was in the hospital were obtained in violation of his *Miranda* rights and that those statements also were not voluntarily given as a result of his weakened physical condition. In response, the state contends that the defendant voluntarily waived his *Miranda* rights and that his statements to officers were made voluntarily.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, the defendant filed a motion to suppress "any and all statements made by the defendant" while at the hospital on the basis that the statements were obtained in violation of the fifth amendment to the United States constitution, the due process clauses of the United States and Connecticut constitutions, § 54-1o, and the psychiatrist-patient privilege.[3] The parties submitted briefs and made oral arguments. The trial court held a three day evidentiary hearing on the motion.

At that hearing, two officers from the Middletown Police Department, Detective Dane Semper and Officer Lee Buller, testified regarding the interrogation of the defendant that Semper conducted at the hospital on July 6, 2015. Around noon that day, Buller, who had been stationed inside of the defendant's hospital room, saw that the defendant was awake. Semper was notified and then went to the hospital in order to speak with the defendant about the events of the preceding night. Before speaking with the defendant, Semper gave Buller a video camera and instructed him to record the interrogation. The parties disagree as to whether Semper read the defendant his *Miranda* warnings prior to questioning him. See footnote 6 of this opinion. Semper then proceeded to question the defendant regarding the manner in which he threw his baby from the bridge.[4] This topic was of paramount importance because the baby had not yet been found at the time the interview took place.

During this initial conversation, Buller was having trouble getting the video camera to record, and Semper briefly stopped speaking with the defendant to help get the camera working. Eventually, Buller got the video camera working but was only able to record about seven minutes of the thirty-five minute interview. The recording began with Semper's asking the defendant about the manner in which he threw the baby off of the bridge. Throughout the seven minute video, the defendant either made no response to Semper's questions or responded with brief verbal answers, shrugs, nods, or shakes of his head.

At one point, Semper made a basketball analogy to further his efforts to determine the baby's trajectory when he was thrown from the bridge. He asked the defendant whether he threw the baby off the bridge in a manner more like a half-court shot, three pointer, or free throw. In response, the defendant asked Semper to turn off the camera. Semper then moved the camera to the hallway but continued to record the conversation. Semper returned to the defendant's room and asked him again how the baby was thrown from the bridge. This time, the defendant responded by saying "free throw." Buller also testified that the defendant never asked about his baby while he was at the hospital.

The trial court also heard evidence regarding the defendant's medical condition at the time of the police interview. A nurse who attended the defendant in the intensive care unit on the day of the interview testified that the defendant had last been given short acting pain medicine at least two hours prior to the interview. She further testified that he was lucid, able to communicate, speak, and follow commands appropriately. A physician who did not personally examine the defendant, but reviewed his chart several hours prior to the interview, initially testified that he did not think a patient who was given the same medications as the defendant could make complex judgments. He later testified, however, that he did not know if a patient in that situation could make complex judgments and that a psychiatric consultation would be needed to know for sure. A physician's assistant, who performed a brief assessment of the defendant about ninety minutes prior to the interview, testified that he could follow commands well at that point and that he had not had any medication administered to him at least thirty minutes prior to her examination. Finally, just after Semper's interview, the defendant spoke clearly and coherently with Samira Solomon, a psychiatry resident who interviewed him.

The trial court denied the defendant's motion to suppress. In making its ruling, the court determined that the defendant voluntarily, intelligently, and knowingly waived his *Miranda* rights. It also concluded that, on the basis of testimonial evidence of medical personnel regarding the defendant's physical and mental condition, the defendant's statements to Semper were made voluntarily.[5] Accordingly, at trial, the video recording was introduced into evidence. The state also introduced testimony from Semper regarding the interrogation, including the "free throw" statement made by the defendant and the testimony from Buller that the defendant never asked about his baby's welfare while he was in the hospital. These pieces of evidence—the defendant's response to Semper's question about the manner in which he threw his baby off the bridge and Buller's testimony that the defendant never asked about his baby while he was in the hospital—are the focus of the

defendant's challenge in this appeal.

On appeal, the defendant first claims that the trial court improperly denied his motion to suppress because any waiver of his *Miranda* rights while speaking with the officers at the hospital was involuntary.[6] As a result, the defendant asserts that the trial court improperly admitted the officers' testimony regarding the interrogation. He also claims that any statements made to officers also were involuntary as a result of his weakened physical condition.[7] He further argues that the error was harmful because the challenged evidence was used to impeach his trial testimony that his baby had slipped from his hands.

The state counters that the trial court correctly concluded that the defendant had waived his *Miranda* rights and agreed to speak with Semper. In particular, it claims that the trial court properly credited the testimony from Semper and Buller that the defendant waived his *Miranda* rights, that the defendant was familiar with his rights from a prior arrest unrelated to the present case, and that the defendant was not under the influence of any medications that would impair his ability to freely and rationally decide to waive his rights at the time of the interview. The state also contends that the defendant's statements were made voluntarily because he suffered only minor injuries, was lucid and alert, and was able to communicate appropriately at the time of the interview. Finally, the state claims that, even if the trial court improperly admitted the challenged evidence, any error was harmless beyond a reasonable doubt. We agree with the state that, even if we assume that the trial court improperly admitted the challenged evidence, any error in that regard was harmless beyond a reasonable doubt.

It is well settled that, "[i]f statements taken in violation of *Miranda* are admitted into evidence during a trial, their admission must be reviewed in light of the harmless error doctrine. . . . [W]hether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010). "Whether [an] error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony

was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 805, 91 A.3d 384 (2014).

We turn to the first factor—namely, the importance of the challenged testimony to the state's case. The defendant claims that the challenged testimony was important to the state's case because it contradicted his own testimony at trial that he accidentally dropped his baby off the bridge and the state used the testimony to impeach him. He also asserts that the state emphasized Buller's testimony that he never asked about his baby while he was in the hospital. We disagree that the challenged testimony was important to the state's case.

In the present case, there was overwhelming, independent evidence of the defendant's intent to kill his baby that the jury could have credited. The text messages sent by the defendant to the baby's mother on the night of the murder were arguably the most persuasive evidence of the defendant's intent. In those messages, prior to throwing his baby off the bridge, he taunted and threatened the baby's mother, saying, *inter alia*, "there was a problem regarding our son," "[y]ou won't talk to me tomorrow or any other day," "[t]here is no more days," and "[e]njoy your new life without us . . . ."

Then, after throwing the baby off the bridge, the defendant told the baby's mother through text messages that "[y]ou tried to take him away from me. You failed. I didn't . . . . Enjoy your life without us now," "[y]our not a parent anymore," and "[the baby is] dead . . . [a]nd soon I will be too . . . ."

These text messages were powerful evidence demonstrating the defendant's intent to kill his baby. Additionally, Solomon, a psychiatry resident who interviewed the defendant the same day that he spoke with Semper, testified at trial that the defendant told her that he intended to take his baby's life that night. Specifically, Solomon testified that the defendant stated "he became more clear about things last night after he got off the phone with [the baby's mother] and decided he had to take his son's life and his own because he was so afraid of his son living in his current life situation." This evidence further demonstrated that killing his baby was decidedly not accidental. Rather, the defendant specifically intended to kill his baby.

Solomon's testimony also was corroborated and augmented by Buller. After the defendant had consented to Buller's presence in the room while Solomon interviewed him, Buller heard the defendant say that, on the night of the murder, "he wasn't even emotional as he

approached the bridge" and that "he knew what he needed to do." Buller further testified that the defendant said that "[h]e needed to kill his son and then himself" because "he was uncertain about what would happen to his son once he was gone." The defendant "didn't want [the baby's maternal family] raising him with all their bullshit," and "the only way he knew that his son would be safe was to kill his son and then himself." The foregoing represents potent evidence of the defendant's intent to kill his baby and his reasons for wanting to do so.

Other evidence contributing to the strength of the state's case was testimony by the defendant's mother that the defendant called her from the bridge and told her to pick up the stroller, iPhone, and iPod so that she would have pictures of the baby, yet he made no mention of picking up the baby. He also told his mother to "tell everyone I'm sorry" close to the time that he threw the baby from the bridge and just before he jumped off the bridge himself. Finally, the defendant testified that he woke his baby up at 11 p.m., packed him in a stroller without any diapers or bottles, and brought him to the bridge with him with the intention of committing suicide.

The state also did not highlight the challenged evidence, thus minimizing its importance. During its cross-examination of the defendant, the state never asked him about the "free throw" statement or emphasized that it was at variance with any part of his testimony. Furthermore, in the state's summation, the state only briefly mentioned the "free throw" statement.[8] With regard to Buller's testimony that the defendant never asked about his baby, the state did emphasize this for the jury in summation.[9] Significantly, however, the defendant himself admitted to this when he testified, and, in summation, the state did not specifically attribute that testimony to Buller.

Additionally, the challenged evidence was cumulative of other evidence of the defendant's intent that had been presented by the state. The text messages and the testimonies of Solomon and Buller were all evidence of the defendant's intent to kill his baby. The state also presented evidence that the defendant himself admitted to the jury that he chose not to call for help after his baby fell from the bridge and that he never once asked about his baby's welfare the following day. Thus, to the extent that the challenged evidence indicates that he intended to kill his baby by throwing him from the bridge, the free throw statement and lack of concern are essentially inconsequential in light of the foregoing overwhelming, independent evidence establishing his intent to kill.

We conclude that, even without the challenged evidence, there was overwhelming, independent evidence of the defendant's intent to kill his baby. The state's case

was strong, the challenged evidence was cumulative of other evidence, and the defendant was able to cross-examine the state's witnesses. Given the strength of the state's other evidence, the challenged evidence did not influence the jury. Accordingly, we conclude that, even if the trial court improperly admitted the challenged evidence, the state has met its burden of demonstrating that any error in that regard was harmless beyond a reasonable doubt.

## II

The defendant next claims that the trial court improperly denied his motion to suppress because officers conducted a custodial interrogation that was not electronically recorded, as required by § 54-1o.[10] Specifically, the defendant claims that his hospital room was a "place of detention,"[11] as defined in § 54-1o, and that he was in custody for purposes of that statute. He further contends that the presumption of inadmissibility that attaches to unrecorded custodial interrogations in places of detention cannot be overcome because the statements are not reliable and were not made voluntarily. See General Statutes § 54-1o (d).[12]

In response, the state claims that the trial court properly denied the defendant's motion to suppress because police officers had no obligation to record the interrogation pursuant to § 54-1o. In particular, the state does not challenge that the defendant was in custody or that it was an interrogation but instead contends that a hospital room is not a "place of detention" for purposes of the statute. Alternatively, the state claims that any error in denying the defendant's motion to suppress was harmless.

The electronic recording requirement expressed in § 54-1o applies only to custodial interrogations conducted at a place of detention. See footnote 10 of this opinion. In denying the defendant's motion to suppress, the trial court concluded that § 54-1o was inapplicable because the defendant's hospital room was not a "place of detention" as defined in the statute. It is not necessary for us to decide in this case, however, whether a hospital room qualifies as a place of detention under the statute because, even if we assume that a hospital room is a place of detention, the admission of the challenged evidence in the present case was harmless. Thus, we conclude that, even if the trial court incorrectly denied his motion to suppress on this basis, any error was harmless.

Where, as here, "an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the [impropriety] was harmful. . . . [A] nonconstitutional [impropriety] is harmless when an appellate court has a fair assurance that the [impropriety] did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v.

*Guilbert*, 306 Conn. 218, 265, 49 A.3d 705 (2012). Moreover, "[w]hether [the improper admission of evidence] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative . . . the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 364, 933 A.2d 1158 (2007).

We already have concluded in part I of this opinion that the state met its burden of proving that any improper admission of the challenged evidence was harmless beyond a reasonable doubt. For similar reasons, we further conclude that the defendant has not met his burden of proving that the admission of that evidence substantially affected the verdict.

As discussed previously, the state's case was strong because, even without the challenged evidence, there was overwhelming, independent evidence of the defendant's guilt. Specifically, the state presented the following evidence: (1) the incriminating text messages that had been sent by the defendant to the baby's mother on the night of the murder; (2) testimony from both Solomon and Buller that the defendant had stated that he intended to kill his baby that night on the bridge because he didn't want the baby's maternal family "raising him with all their bullshit"; (3) testimony from the defendant's mother that the defendant had called her from the bridge and told her to pick up the stroller, iPhone, and iPod so that she would have pictures of the baby but that he had not mentioned picking up the baby; (4) testimony that the defendant had asked his mother to "tell everyone I'm sorry"; and (5) the deleted note that the defendant had written in his phone to the same effect shortly after killing his baby and before attempting to take his own life. The defendant also admitted to the jury how he chose not to call for help that night on the bridge, that he never asked about his baby's welfare the following day, and that he brought his baby with him to the bridge with the intention of committing suicide.

In light of this overwhelming, independent evidence demonstrating the defendant's intent to murder his baby, the "free throw" statement to Semper and Buller's testimony that the defendant never asked about his baby were inconsequential and did not substantially affect the verdict. Consequently, on the basis of the foregoing, even if we assume that the trial court improperly admitted the defendant's statements made during the interview with Semper in violation of § 54-1o, any such error was harmless.

## III

The defendant also claims that the trial court's refusal to permit him to introduce into evidence a letter in which he offered to plead guilty to a lesser offense deprived him of his right to present a defense under the sixth amendment to the United States constitution.[13] He further claims that evidence of the offer was relevant and not self-serving. The state counters that the trial court did not abuse its discretion in precluding the defendant from introducing the letter into evidence because it was not relevant, it was self-serving, and it was inadmissible hearsay. We conclude that the trial court properly exercised its discretion in prohibiting the defendant from introducing the letter into evidence because it was not relevant.

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to trial, the defendant offered to plead guilty to the lesser offense of manslaughter in exchange for a prison term of twenty-five years incarceration. The defendant conveyed the plea offer to the state in a letter. The state rejected the offer. Thereafter, the defendant made an oral motion seeking to introduce the letter into evidence at trial as a judicial admission on the basis that the offer was a conclusive admission that he accepted criminal responsibility for the death of his child but with the mental state associated with manslaughter. The defendant did not reveal the specific contents of the letter to the trial court during the hearing on the motion. He further claimed that evidence of his offer to plead to a lesser offense was a verbal act and that it was not self-serving. In response, the state objected to the admission of any evidence of his offer to plead to a lesser offense because of the inability to cross-examine the letter. The trial court denied the defendant's motion on the basis that it was not a judicial admission and was instead self-serving hearsay.

At the close of the state's presentation of evidence and just prior to the defendant's testimony, the defendant again sought the court's permission to introduce evidence of his offer to plead to a lesser offense, this time in the form of testimony from the defendant. Again, the specific details of the offer were not revealed to the trial court. The state objected on grounds that the evidence was neither relevant nor material. The trial court denied the defendant's request to introduce evidence of his plea offer, concluding that it was not relevant or material, and that it would inject collateral issues into the jury's determination of whether the state had met its burden of proving that the defendant acted with intent. The defendant immediately moved for a mistrial, claiming that the denial of the opportunity to present evidence of his willingness to enter a plea deprived him of his right to present a defense pursuant to the sixth amendment of the United States constitu-

tion. The trial court then denied his motion for a mistrial.

We begin by setting forth the standard of review and the principles of law governing the defendant's claim. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 354–55, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

Furthermore, "[t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment right to compulsory process includes the right to . . . present the defendant's version of the facts . . . to the jury so that it may decide where the truth lies. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 252–53, 856 A.2d 917 (2004).

It is well settled that "[t]he trial court has broad discretion in determining the relevancy of evidence." *State* v. *Lombardo*, 163 Conn. 241, 243, 304 A.2d 36 (1972). "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Internal quotation marks omitted.) *State* v. *Perkins*, supra, 271 Conn. 253.

Conversely, "[e]vidence is irrelevant or too remote if there is 'such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in . . . proof of the latter.' " *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995), quoting *State* v. *Kelly*, 77 Conn. 266, 269, 58 A. 705 (1904). "Evidence that is not relevant is inadmissible." Conn. Code Evid. § 4-2.

Because irrelevant evidence is not admissible, we

must first address whether the trial court abused its discretion in concluding that the evidence was not relevant to any issue before the jury. It is undisputed that the only contested issue at trial for the jury to determine was whether the defendant intended to murder his baby or whether the baby's death was accidental. The proffered evidence was of no assistance to the jury in carrying out this task. We conclude, therefore, that evidence of the defendant's offer to plead guilty was not relevant.

In an analogous context, our rules of evidence prohibit the admission of evidence related to settlement negotiations. Indeed, in civil cases, it is well settled that offers to compromise or settle are inadmissible with very few exceptions. See Conn. Code Evid. § 4-8. This is because settlement offers are of little probative value with respect to the central issues of liability or the amount of the claim. See Conn. Code Evid. § 4-8, commentary. Part of the reason for this prohibition, as stated in the commentary to § 4-8, is that "a party, by attempting to settle, merely may be buying peace instead of conceding the merits of the disputed claim." Conn. Code Evid. § 4-8, commentary. Another reason for the prohibition is that the admission of settlement evidence supports the important policy of encouraging parties to engage in settlement negotiations. See Conn. Code Evid. § 4-8, commentary. We find these same reasons equally applicable to criminal cases with respect to plea bargaining and the use of evidence related thereto.[14]

Indeed, plea bargaining "is an essential component of the administration of justice. Properly administered, it is to be encouraged." *Santobello* v. *New York*, 404 U.S. 257, 260, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971). "[I]t is essential that plea negotiations remain confidential to the parties if they are unsuccessful. Meaningful dialogue between the parties would, as a practical matter, be impossible if either party had to assume the risk that plea offers would be admissible in evidence." *United States* v. *Verdoorn*, 528 F.2d 103, 107 (8th Cir. 1976). As the Ohio Court of Appeals aptly stated in *State* v. *Davis*, 70 Ohio App. 2d 48, 51, 434 N.E.2d 285 (1980), "[i]f the prosecutor must bargain with a defendant whose responses are framed with an eye toward their self-serving use at trial, we see little profit to be anticipated from their discussions . . . . Destroy confidentiality, and negotiators tend to make speeches and assume postures, tendencies inherently inimical to compromise."

Moreover, similar to settlement negotiations in the civil context, "[t]he considerations involved in plea bargaining are infinitely variable and complex. For instance, considerations may include: the seriousness of the offense, the availability or suitability of lesser included offenses, the record of the accused, the quality

and quantity of the evidence on both sides, the availability and cooperativeness of witnesses or accomplices, unresolved legal issues, probable length of trial and difficulty of trial preparation, and a host of other no-less-significant factors, very few of which bear directly upon the only question the triers of fact will be called upon to decide, i.e., the guilt or innocence of the accused of the crime charged. . . . It seems obvious that any testimony concerning such negotiations will far more likely than not reflect . . . legally extraneous considerations, rather than anything relevant to, or probative of, the ultimate issue on trial." (Citations omitted.) Id.

Due to the myriad reasons a defendant may offer to plead guilty, there is simply no open and visible connection between an offer to plead guilty to a lesser offense, made months after the crime, and the defendant's state of mind at the time of the crime, which is what the jury needed to decide in this case. The defendant made his plea offer just prior to his trial on the charges of murder and risk of injury to a child when he was facing a potential sentence of seventy years incarceration. His offer to plead to the lesser offense of manslaughter in exchange for twenty-five years incarceration likely was a tactical decision and does not reflect on his intent to kill his baby on the night of the murder.

In any event, given that there are so many considerations involved in plea bargaining, we are unpersuaded that evidence of the defendant's willingness to plead guilty to a lesser offense in exchange for a significantly shorter period of incarceration was relevant to the issue before the jury, i.e., the defendant's state of mind at the time that the crime was committed. Knowing that there are many reasons why a defendant would choose to plead guilty, we also agree with the trial court that admission of the evidence would inject collateral issues that could confuse the jury.[15]

Because we conclude that the evidence was not relevant, it was not admissible.[16] Therefore, under the circumstances of this case, we cannot conclude that the trial court abused its discretion by precluding the admission of the defendant's offer to plead guilty.

Our conclusion finds support in other jurisdictions that have considered a similar issue—namely, whether a defendant may present evidence regarding an offer made by the state and rejected by the defendant. Those courts have concluded that evidence of plea bargaining is not relevant and that its admission is outweighed by possible confusion of the issues. See *State* v. *Woodsum*, 137 N.H. 198, 201–202, 624 A.2d 1342 (1993) (explaining "a defendant's posture in plea negotiations at a date after the alleged offense . . . is at best weak evidence of the defendant's state of mind at the time of the alleged crime, and is not relevant to any other element of a

chargeable offense"); see also *United States* v. *Goffer*, 721 F.3d 113, 129 (2d Cir. 2013) (concluding that evidence of defendant's rejection of plea offer, which he sought to admit to show "consciousness of innocence," had no probative value), cert. denied,      U.S.      , 135 S. Ct. 63, 190 L. Ed. 2d 60 (2014); *State* v. *Orji*, 277 N.J. Super. 582, 587–88, 649 A.2d 1368 (App. Div. 1994) (concluding that evidence of defendant's rejection of state's offer to enter pretrial intervention program was not relevant because no logical connection existed between his rejection of state's offer and his professed innocence); *State* v. *Pearson*, 818 P.2d 581, 584 n.6 (Utah App. 1991) ("[The court] seriously question[s] whether plea negotiations are relevant evidence in a criminal prosecution. The negotiation strategy and positioning of either the defense or the prosecution is not evidence of the elements of the crimes charged."). While the aforementioned cases are factually distinguishable, we find their reasoning persuasive to our resolution of the issue before us.

On the basis of the foregoing, we conclude that the trial court did not abuse its discretion in excluding evidence of the defendant's offer to plead to the lesser offense of manslaughter in exchange for twenty-five years incarceration because it was not relevant to the issue before the jury, namely, whether the defendant intended to cause his baby's death.

The judgment is affirmed.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e; *State* v. *Jose G.*, 290 Conn. 331, 963 A.2d 42 (2009).

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The defendant appealed to the Appellate Court, and that appeal was subsequently transferred to this court pursuant to General Statutes § 51-199 (b) (3) and Practice Book § 65-4.

[3] The defendant does not pursue his claim regarding the psychiatrist-patient privilege on appeal.

[4] We note that a nurse who attended to the defendant in the intensive care unit testified that the defendant wore "mitts," or medical restraints, which tethered his hands to the hospital bed, so that he would not pull at the various medical apparatuses that were connected his body. She clarified that these restraints were not requested by the police officers and that they solely served a medical purpose.

[5] The trial court was free to discredit the defendant's claim of a weakened physical condition.

[6] The defendant states in his brief that "the only warnings [he] received were the following . . . Semper asked (1) if [the defendant] would like to have a lawyer present . . . and (2) whether it is okay to talk to him without a lawyer . . . ." To the extent the defendant intends to challenge the trial court's finding that *Miranda* warnings were, in fact, given to him, we defer to the trial court's determination that Semper and Buller credibly testified that they gave the warnings. See *State* v. *Whitaker*, 215 Conn. 739, 757, 578 A.2d 1031 (1990) (whether police officer truthfully testified that *Miranda* warnings were given is "question of credibility, and as such, is for the trier of fact to determine"); *State* v. *Madera*, 210 Conn. 22, 36–37, 554 A.2d 263 (1989) (whether police advised defendant of *Miranda* rights is question of credibility of witness for trier of fact).

[7] The defendant also claims that, upon receiving a letter from the public

defender's office notifying him of the availability of its legal assistance, an attorney-client relationship was established so that further interrogation by officers with no action on behalf of the defendant was precluded. See *State* v. *Stoddard*, 206 Conn. 157, 169–70, 537 A.2d 446 (1988). In response, the state asserts that the defendant abandoned this claim at oral argument before the trial court. In its memorandum of decision on the defendant's motion to suppress, the trial court states that, "at oral argument, the defendant withdrew any claims made pursuant to . . . *Stoddard* . . . ." Therefore, we will not consider this claim on appeal. See, e.g., *State* v. *Saucier*, 283 Conn. 207, 222–23, 926 A.2d 633 (2007) (declining to review previously abandoned claim).

[8] In reminding the jury about the testimony of the witness who saw the defendant on the bridge that night, the state argued that, "had she looked at that rearview mirror, she would have seen the free throw that the defendant talks about later." The state mentioned the challenged testimony a second time when it stated: "While at Hartford Hospital, [the defendant] gave two statements. One to [Semper], where the defendant admitted throwing his son off the bridge. Now counsel may . . . show you the video and say, really, does it say anything. Granted, the quality is poor."

[9] The state argued that "what's important and this is a big piece of evidence that's very important, not once . . . does the defendant ask for his son, ask for the whereabouts of his son."

[10] General Statutes § 54-1o (b) provides: "An oral, written or sign language statement of a person under investigation for or accused of a capital felony or a class A or B felony made as a result of a custodial interrogation at a place of detention shall be presumed to be inadmissible as evidence against the person in any criminal proceeding unless: (1) An electronic recording is made of the custodial interrogation, and (2) such recording is substantially accurate and not intentionally altered."

[11] General Statutes § 54-1o (a) (4) defines " '[p]lace of detention' " as "a police station or barracks, courthouse, correctional facility, community correctional center or detention facility . . . ."

[12] General Statutes § 54-1o (h) provides: "The presumption of inadmissibility of a statement made by a person at a custodial interrogation at a place of detention may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances."

[13] We note that the right to present a defense has been made applicable to the states through the fourteenth amendment to the United States constitution. See *Washington* v. *Texas*, 388 U.S. 14, 17–19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (incorporating right to compulsory process); *State* v. *Perkins*, 271 Conn. 218, 252–53, 856 A.2d 917 (2004) (sixth amendment right to compulsory process includes right to present defendant's version of the facts).

[14] We note that the Connecticut Code of Evidence recently was amended to include § 4-8A, which addresses the admissibility of pleas and related statements in civil or criminal cases. See Conn. Code Evid. § 4-8A. The application of that rule is, however, limited to situations in which evidence of the plea is offered against the defendant.

[15] We also note that the defendant never identified, and the trial court was not aware of, whether his offer indicated a willingness to plead guilty under *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), to enter a plea of nolo contendere, or an unqualified plea. Pursuant to the former two types of guilty pleas, the defendant would not even be admitting any of the elements of the crime but, rather, would be conceding only that there is sufficient evidence for the state to obtain a conviction. See *State* v. *Palmer*, 196 Conn. 157, 169 n.3, 491 A.2d 1075 (1985) ("[a] guilty plea under the *Alford* doctrine is a judicial oxymoron in that the defendant does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea nevertheless"); *State* v. *Godek*, 182 Conn. 353, 364, 438 A.2d 114 (1980) ("[t]hroughout its history . . . the plea of nolo contendere has been viewed not as an express admission of guilt but as a consent by the defendant that he may be punished as if he were guilty and a prayer for leniency" [internal quotation marks omitted]), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981).

[16] In light of our conclusion that the evidence was not relevant and, thus, was inadmissible, we need not address his additional claim that the evidence was not self-serving.